MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2025 ME 34
Docket:         And-22-302
Argued:         October 3, 2023
Decided:        April 1, 2025

Panel:          MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.*

STATE OF MAINE

v.

CLIFTON THOMAS

LAWRENCE, J.

[¶1]  Clifton Thomas appeals from a judgment of conviction of (1) two counts of aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(C-1)(1), (M) (2024), entered by the trial court (Androscoggin County, *Stewart, J.*) after a jury trial and (2) one count of criminal forfeiture of property, 15 M.R.S. § 5826 (2020),[1] ordered by the court.  On appeal, Thomas raises issues concerning (1) the denial of his motions to suppress, (2) discovery rulings, (3)  his right to confront a chemist who did not testify, (4) the chain of custody of the drug evidence, (5) the sufficiency of the evidence to support his

---

  \* Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

  1 Title 15 M.R.S. § 5826 has since been amended, though the amendments are not relevant in the present case.  *See* P.L. 2023, ch. 196 § 1 (effective Oct. 25, 2023) (codified at 15-M.R.S. § 5826 (2024)); P.L. 2021, ch. 454, § 13 (effective Oct. 18, 2021) (codified as subsequently amended at 15 M.R.S. § 5826 (2024)).

2

convictions for aggravated drug trafficking, and (6) statements that the prosecutor made during closing arguments. We determine that the trial court did not commit reversible error regarding the first two issues, but we conclude that Thomas's confrontation rights were violated and that this violation was not harmless. We therefore vacate the judgment of conviction and remand for further proceedings consistent with this opinion.[2]

## I. BACKGROUND

[¶2] The factual background of this case arises from the events of another criminal case involving Thomas. *See State v. Thomas*, 2022 ME 27, 274 A.3d 356. In that case, we affirmed a judgment convicting Thomas of six offenses relating to domestic violence and conduct with a firearm in February 2020, after he physically assaulted a former romantic partner, threatened the victim with a loaded firearm, and took the victim's cell phone. *Id.* ¶¶ 1 & n.1, 2-4, 31.

[¶3] After the victim reported those incidents to the police, the police learned that Thomas might be staying at a certain apartment, observed Thomas at the building via a surveillance video, conducted a search of the apartment pursuant to a warrant, and located "a .22 caliber handgun, ammunition, and the

---

[2] In light of this determination, we do not reach Thomas's fourth, fifth, and sixth issues.

victim's cell phone." *Id.* ¶¶ 3-4. The search also resulted in the discovery of the drugs, drug paraphernalia, and firearm at issue in this case.

[¶4] Thomas was charged by indictment filed on October 6, 2020, with two counts of aggravated trafficking of scheduled drugs (Class A) (Counts 1-2), 17-A M.R.S. § 1105-A(1)(C-1)(1), (M); one count of possession of a firearm by a prohibited person (Class C) (Count 3), 15 M.R.S. § 393(1)(A-1)(3) (2020);[3] and one count of criminal forfeiture of property (Count 4), 15 M.R.S. § 5826. Thomas pleaded not guilty to Counts 1-3 and denied Count 4. The State dismissed Count 3 on November 4, 2021, due to a potential double jeopardy issue because of Thomas's conviction in his domestic violence case, where the court did not "specify[] which firearm it was basing the conviction on."

## A. Motions to Suppress

### 1. Probable Cause for the Search Warrant

[¶5] On March 17, 2021, Thomas filed a motion to suppress evidence obtained during a search conducted pursuant to a warrant, contending that the affidavit supporting the request for the search warrant "did not establish probable cause sufficient to support the warrant issued." On March 26, 2021,

---

[3] Title 15 M.R.S. § 393(1)(A-1)(3) has since been amended, though the amendments are not relevant to this appeal. *See* P.L. 2023, ch. 491 §1 (effective Aug. 9, 2024) (codified at 15 M.R.S. § 393(1)(A-1)(3) (2024).

4

the court (*Stanfill, J.*) held a hearing on the motion to suppress. The court admitted in evidence multiple exhibits, including a copy of the search warrant.[4]

[¶6] In May 2021, the court entered an order denying the motion to suppress. The court first determined that Thomas had sufficient connections to the apartment to establish standing to challenge the search. The court then concluded that the affidavit established probable cause to believe that Thomas "committed the domestic violence crimes and that he was in possession of a firearm and [the domestic violence victim's] cell phone."

[¶7] The court determined, however, "that there was absolutely nothing in the warrant application about drugs, much less probable cause for a search for violation of drug laws," and it thus "severed the specific authorization in the warrant to search for drug related items." The court nonetheless held that suppression of the drugs and related items was not warranted because the State had asserted that the items "were found in plain view during the

---

[4] The affidavit stated, inter alia, that the domestic violence victim reported to police that late on February 26 Thomas had taken her cell phone and was in possession of a firearm; Thomas was seen shortly thereafter on the surveillance video going in and out of the Lewiston address where he was known to stay. When arrested the next day, he no longer had the gun or cell phone on his person.

legitimate search under the warrant,[5] and the court was given no reason in this hearing to find otherwise."[6]

### 2. Nature and Scope of the Search

[¶8] In April 2021, Thomas filed a second motion to suppress evidence obtained in the search conducted pursuant to the same search warrant. The motion requested an evidentiary hearing regarding the nature and scope of the search. On April 30, 2021, and on May 4, 2021, the court (*McKeon, J.*) held a hearing on the second motion to suppress.[7] On May 14, 2021, the court (*McKeon, J.*) entered an order denying the second motion to suppress.

[¶9] The court found the following facts, which are supported by competent evidence from the record at the hearing. *See State v. Wai Chan*, 2020 ME 91, ¶ 5, 236 A.3d 471. On February 27, 2020, law enforcement officers knocked on the door of the apartment of S.P., a friend of Thomas's, and she let them inside. A detective completed a security check and left the apartment to

---

[5] The court also determined that the warrant was "valid without identifying the specific offense for which there is probable cause."

[6] During the hearing, the court asked defense counsel, "And so if they are searching in a place, assuming—and I know you don't agree with this, but assuming they had probable cause to be searching—a lawful warrant and probable cause to be searching for a firearm, a handgun, on the premises, so long as they're searching appropriately for that, if they came across drugs, drug contraband, et cetera, you agree that would be seizable?" Defense counsel answered, "I think that's what the case law says."

[7] At the hearing, Thomas "conceded that . . . the evidence relevant to [the domestic violence case] was legally obtained during the search."

6

await a search warrant. The search warrant "permitted a search for firearms, ammunition and a cellphone." While searching in a bedroom closet, the detective found a handgun in a box and ammunition in a coat pocket and in a backpack pocket. Upon further search of the backpack, the detective felt something that could have been the butt of a handgun or ammunition. The detective opened a pocket and found a scale and about fifty grams of fentanyl.

[¶10] In its order, the court "assume[d] there was no probable cause to search for drugs." It determined that law enforcement was authorized to search for firearms, ammunition, and a cell phone; that ammunition and the cell phone both "are, or can be, very small"; that once the officer felt something in the backpack pocket that could have been any of the items the officer was authorized to search for, it was permissible for the officer to search the pocket, particularly because "ammunition had already been discovered in another pocket in that backpack"; and that once the officer lawfully opened the pocket, the officer "was in a position to see the drugs and scale and the plain view doctrine" allowed the officer to seize the items.

**B.    Discovery**

**1.    Cell Phones, Surveillance Video, and Coat**

[¶11]  In January 2021, Thomas filed a motion for discovery, requesting access to security footage of the apartment from February 27, 2020, and a cell phone seized from his person incident to his arrest; he argued that law enforcement had turned over the phone to the New York City police department due to an indictment there and that the phone contained evidence that would discredit potential witnesses.  In February 2021, Thomas filed another letter, captioned as a motion for additional discovery, again requesting these items.

[¶12]  In March 2021, the court (*Stanfill, J.*) held a hearing on Thomas's motion for discovery.  The court stated that the hearing related to a motion for additional discovery that Thomas filed on November 17, 2020, in his domestic violence case, but that "the motion for additional discovery is really in both—with regard to the cell phones is really as to both cases."  The court said that, in the domestic violence case, it had ordered the police to retrieve certain messages between Thomas and the victim from Thomas's cell phone, which had been turned over to the New York City police department.

8

[¶13]  In April 2021, Thomas filed a motion for discovery sanctions.  The motion alleged that the State provided an incomplete surveillance video showing the activity in the hallway outside the apartment that was subject to the search.  Thomas requested an evidentiary hearing and for the court to impose a discovery sanction if law enforcement intentionally failed to preserve the video.

[¶14]  In May 2021, the court entered an order denying Thomas's letters requesting discovery and Thomas's discovery motion in his domestic violence case.  The court found the following facts, which are supported by competent evidence in the hearing record.  *Wai Chan*, 2020 ME 91, ¶ 5, 236 A.3d 471.  When Thomas was arrested, United States Marshals were looking for him due to pending charges in New York.[8]  When Thomas was brought to jail, the inventory showed that he had two cell phones.  The phones were checked into evidence but later requested by and turned over to the New York City police department.  As of April 2021, when the court issued its order on the discovery motions, the cell phones had not "been returned to any Maine police agency."

---

[8]  The court also found that when Thomas "was arrested for these charges . . . [he] was also being investigated for drug involvement by the Lewiston Police Department."  During the hearing, a detective of the Lewiston Police Department testified that he became the lead investigator in the drug case against Thomas but that he was not involved in Thomas's arrest.  There otherwise was no testimony regarding Maine law enforcement's investigation of Thomas's involvement in drug trafficking.

[¶15] At the hearing, the State contended that it was unable to get the phones back. The court applied the same analysis used when evidence is destroyed while in the State's possession, but it determined that the phones did not have apparent exculpatory value before they were turned over and that at best they were "potentially useful." The court stated that "[o]ther than the general suggestion that cell phones often contain information about the relationship between alleged abusers and victims in domestic violence cases, [law enforcement] had no particular reason to think the cell phones would have exculpatory information or indeed any relevant information related to this case when they were turned over to [the New York City police department]." Further, the court concluded that Thomas had failed to prove that the "State acted in bad faith when it transferred the cell phones to [the New York City police department] and failed to preserve them."

[¶16] On April 30, 2021, and on May 4, 2021, the court (*McKeon, J.*) held a hearing on Thomas's motion for sanctions regarding the missing surveillance video. On May 14, 2021, the court entered an order denying the motion for sanctions. The court made the following findings of fact, which are supported by competent evidence in the hearing record. *See Wai Chan*, 2020 ME 91, ¶ 5, 236 A.3d 471.

10

[¶17]   At the request of the New York City police department, on March 3, 2020, a Lewiston police department sergeant met with the property manager of the apartment where S.P. lived and downloaded video from four dates, including February 27, 2020.  The videos were downloaded from two surveillance cameras, one pointing at the elevator and the other looking down the hallway toward S.P.'s apartment.[9]  The sergeant viewed only parts of the videos, focusing on the elevator video.

[¶18] After local law enforcement obtained the videos, they realized that they could not view the videos.  "Unable to recover the video on their own efforts, they sent it down to an FBI office" to try to recover the video.  A Lewiston police department detective talked to the property managers and discovered that "all of the video had been routinely erased."  The FBI was able to recover video,[10] which was admitted as an exhibit, but the video of the hallway has a gap between around 5:50 p.m.[11] and 9:38 p.m. and does not include the time of law enforcement's search.

---

[9]  The video cameras were motion-activated and would not record if there was no activity within the camera's range.

[10]  The court stated, "There was no testimony whether [the FBI] recovered everything or only part of the videos."

[11]  The court said that the gap began at about 5:45 p.m. but the testimony and video reflect that the relevant gap begins at around 5:52 p.m.

[¶19]   The court found it "likely that the activity outside [S.P.]'s apartment at the time of the search would have triggered the video" and that no witness could explain why there was a gap in the video, but that Thomas did not provide any testimony about the likelihood that the missing portion would provide exculpatory evidence.

[¶20]  The court determined that the tape was in the State's control and "the State had the opportunity to preserve the evidence," but that, even if the video camera recorded additional activity, the court had "no information whether or not the missing section of videotape was exculpatory" and that at best the recording may "be potentially useful."  The court further determined that there was insufficient evidence "that the State acted in bad faith."

[¶21]   On November 15, 2021, Thomas filed a motion for discovery regarding the two cell phones and a coat seized during the search.  Thomas objected to the introduction of evidence regarding the coat because the coat was not in law enforcement's custody and Thomas could not inspect it.  Thomas argued that the cell phones contained exculpatory text messages "crucial to [his] defense that the drugs in question did not belong to him."  Thomas requested that the court order production of this evidence or dismiss the indictment.

12

[¶22]  The court (*Stewart, J.*) held a hearing on November 15, 2021.  The court determined that, though the court's (*Stanfill, J.*) order dated April 23, 2021,[12] included only the docket number for Thomas's domestic violence case, the hearing and order addressed discovery issues raised in both cases, and there was no renewed motion after the order.

[¶23]  The court (*Stewart, J.*) denied Thomas's motion on the record and in an order entered on November 16, 2021.  The court found that at the prior hearing on March 26, 2021, there was "no evidence presented . . . that the State . . . was aware of any exculpatory value or evidence on the phones."  The court stated that the phones were previously addressed in the court's order dated April 23, 2021; there was no renewed motion despite the court (*Stanfill, J.*) allowing the parties additional time to file discovery motions; and to the extent not addressed by that order, Thomas did not timely raise issues with respect to the phones.  The court (*Stewart, J.*) also determined that Thomas's objection to the admissibility of the coat was untimely.

---

[12]  The April 23, 2021, order was entered on the docket in this matter on May 14, 2021.

**2.    The State's Witness List, the Communications During Thomas's Incarceration, and the Lewiston Police Officer's Report**

[¶24]  On November 4, 2021, the State and Thomas each filed a witness list.  On November 9, 2021, the State filed a motion to amend its witness list.  On September 7, 2022, Thomas filed a motion for discovery sanctions and another witness list.  Thomas argued that the State had not yet filed a witness list;[13] during discovery the State provided materials in five separate ShareFile[14] folders, one of which was called "Drug Case"; the State "recently advised . . . counsel that there *may* be both incriminating and exculpatory evidence located among thousands of text messages" in a ShareFile folder "related to a separate felony Tampering charge"; the State failed to identify the specific messages where the inculpatory or exculpatory evidence was located; the State "indicated that it is holding off on filing a witness list because it is not sure who it may or may not be adding to the list based on information in the text message dump that it has had for months"; and that the State's actions impeded Thomas's ability to prepare for trial.

---

[13]  Thomas conceded at the hearing on the motion for sanctions that there was a witness list in the file but argued that the State had indicated that it was going to update the witness list and did not send the updated list until "12 hours before jury selection" despite requests from defense counsel.

[14]  ShareFile is an electronic file-sharing service that the District Attorney's office uses to provide defense counsel with discovery materials.

14

[¶25]  On September 9, 2022, Thomas filed a letter stating that he had received "a 43 page report from [a] Lewiston Police Officer" referencing "numerous telephone calls from the Maine State Prison system"; that this report was uploaded to ShareFile that afternoon after jury selection; and that counsel did not plan to read the lengthy materials prior to the start of trial on September 12, 2022.[15]

[¶26]  The court (*Stewart, J.*) held a hearing on the motion for sanctions on September 12, 2022, before the start of trial.  The State argued that the court should deny the motion for sanctions based on the effort it made to apprise current defense counsel[16] of pertinent information and to afford current counsel access to that information.  The court denied Thomas's motion for sanctions, explaining that Thomas's prior counsel had requested a continuance of trial to review the materials in the ShareFile folders and that the State had provided Thomas's current counsel with the text messages and calls in May and told counsel specifically that there was information related to the current case in that material.

---

[15]  At the hearing, Thomas further argued, inter alia, that the production of evidence was "very haphazard"; that the State provided "dozens of audio recordings . . . from the prison that last maybe hundreds of hours"; that the weekend prior to trial the State indicated it intended to pull snippets from the phone calls; and that the Lewiston Police Officer report was not timely provided.

[16]  Thomas's trial counsel had been appointed in May 2022 after prior counsel had withdrawn. Including one co-counsel, Thomas's trial counsel was the fifth attorney appointed to represent him.

## C. State's Motion in Limine Regarding New Chemist's Testimony

[¶27] On September 1, 2022, the State filed a motion in limine requesting the court "to authorize at trial the testimony of" a chemist employed by the State, whom this opinion will refer to as "Chemist Two." The State alleged that another chemist, whom this opinion will refer to as "Chemist One," had analyzed the substance recovered in the case and concluded that the substance was "at least 35 grams net weight of fentanyl" but no longer worked for the State; that Chemist One had moved out of state; that Chemist Two had conducted an independent review of Chemist One's data and had "independently concluded based on the data that the substance tested in this case is fentanyl"; and that Chemist Two could testify about his independent review of the underlying data without violating the Confrontation Clause of the United States Constitution. On September 7, 2022, Thomas filed an objection to the motion in limine, arguing that the expert designation was untimely.

[¶28] The court (*Stewart, J.*) held a hearing on the motion in limine on September 12, 2022, prior to the start of trial, and granted the State's motion. The court found that Chemist Two's testimony would rely on Chemist One's file notes, which contained test results providing a profile and which Chemist Two then compared to the known profile for the substance. The court determined

16

that the State was not attempting to offer Chemist One's certificate; that Chemist Two had conducted a technical review; that the notes that Chemist Two was relying on were signed and dated but were not testimonial;[17] and that Chemist Two was relying on nontestimonial data generated from an instrument to perform "significant independent analysis . . . to come to his final opinions."

### 1.  Technical Review versus Independent Review

[¶29]  The court noted that technical review is distinct from independent review, which was what the court "really need[ed] to look at."  Chemist Two conducted his technical review in the fall of 2020 as part of the lab's routine practice of having a second chemist review the first chemist's work.  Chemist Two explained that technical review is the process that happens after "the chemist that actually does the work has made conclusions," stating, "it's my job—it's the tech reviewer's job to go back to make sure that all of the information that is reflected . . . is accurate and consistent.  And then also check and verify all of the results that have been . . . generated through the testing process."  Chemist Two also described his job as a technical reviewer as "retracing the steps of the actual chemist that's trying to release a certificate. . .

---

[17] Chemist Two testified that the notes were signed and dated to signify who completed the testing and the date of completion and that the notes were not signed under oath, nor was there a sworn statement.

you have to review all data that was generated and all data must be in the packet, so you can see what the chemist did, what the results were. You come to your own conclusions, for the most part. . . . So you're basically doing the same thing they did when they compiled the certificate."

[¶30] The information that Chemist Two reviewed in both his technical review and independent review included data generated by a gas chromatograph and a mass spectrometer, which are collectively referred to as "GC-MS" and which separate compounds in the substance that the lab is analyzing and then identify "a structural fingerprint of the content" of the substance. Chemist Two testified that the GC-MS generated data identifying the substance in this case as containing fentanyl.

[¶31] Chemist Two's independent review consisted of examining the underlying data produced by the GC-MS and notes that Chemist One had taken on a worksheet regarding the weight of the substances. Chemist Two testified that he concluded that each of the two samples in question contained fentanyl. Chemist Two testified that he did not look at Chemist One's certificate of controlled substance analysis in his independent review but that he relied on Chemist One's handwritten notes on the worksheet, "the same things that he would use" to determine weight, including the gross weight. When asked about

the weight of one of the tested substances, Chemist Two stated, after he was given his report to refresh his memory regarding the weight, "again, this is [Chemist One]—from [Chemist One's] worksheet, 22.6431 grams plus or minus 0.0006 grams."

### 2. The Court's Ruling on Chemist Two's Testimony

[¶32]   The court concluded that Chemist Two could testify as to his opinion regarding the composition and weight of the substance.  The court determined that the information would be helpful to the jury and that Chemist Two had the requisite education, training, and experience to provide an expert opinion.  The court further found that the underlying data was unchanged; that the defense was on notice that the State would put on evidence regarding the weight of the drugs; and that although there was a change in witnesses, the witness was "the same analyst that did the technical review."  The court determined that Chemist Two could not testify regarding the precise steps Chemist One took.  The court did not make a finding that Chemist One was unavailable.  The court made a preliminary determination that the chain of custody was intact, despite the absence of Chemist One's testimony.

**D. Trial**

[¶33]  The court held a jury trial on September 12-15, 2022.  The court admitted multiple exhibits in evidence.  During the trial, Thomas objected to the admission of the drug-related exhibits, arguing that the State had not established a sufficient chain of custody.  The court overruled the objection.[18]

[¶34]  The court instructed the jury at the beginning of trial, and prior to closing arguments, that the attorneys' arguments were not evidence.  During its rebuttal closing argument, the State analogized defense counsel's closing argument to a magician's sleight of hand.  Defense counsel did not object to the prosecutor's statements.

[¶35]  The jury returned a verdict of guilty on Counts 1 and 2.  The court ordered a judgment of forfeiture on Count 4 regarding the cash and firearm.  The court held a sentencing hearing on September 16, 2022.  On Count 1, the court sentenced Thomas to eight years' imprisonment,[19] and on Count 2, the court sentenced Thomas to eight years' imprisonment to run concurrently with

---

[18]  On September 14, 2022, Thomas made an oral motion for judgment of acquittal regarding Count 1, and the court denied the motion.

[19]  The court ordered that this period of incarceration run concurrently with the sentence on Count 1 in Thomas's domestic violence case.

the sentence for Count 1. Thomas timely appealed. *See* 15 M.R.S. § 2115 (2024); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

### A. Motions to Suppress

[¶36] Thomas argues that the court erred in denying his motions to suppress.[20] The affidavit presented at the hearing on the first motion to suppress established probable cause to believe Thomas "committed the domestic violence crimes and that he was in possession of a firearm and [the domestic violence victim's] cell phone." We therefore affirm the court's denial of Thomas's first motion to suppress.

[¶37] Regarding the order on the second motion to suppress, Thomas contends that the court's determination that the items were found in plain view was arbitrary because, under the court's rationale that ammunition is small,

---

[20] Thomas contends that the court's order on his first motion to suppress improperly shifted the burden of proof to the defense when it summarily stated, "The State asserts [the drug related] items were found in plain view during the legitimate search under the warrant, and the court was given no reason in this hearing to find otherwise." Thomas argues that the "court made no findings explaining its acceptance of the State's 'assertions,' nor is any such evidence to be found in the transcript of the suppression hearing." We reject Thomas's argument. The order on the first motion to suppress related only to Thomas's probable cause challenge.

Thomas also contends on appeal that in the discovery order dated April 23, 2021, "the trial judge found: 'Defendant was also being investigated for drug involvement by the Lewiston Police Department.'" Thomas argues that this was incorrect because "[n]o such evidence was presented." We reject Thomas's argument because as Thomas concedes, this finding was made in a *separate* order relating to discovery, not in the order on the first motion to suppress.

"the inside of literally any drawer, cupboard, closet, or any other corner of the apartment constitutes 'plain view.'"[21]  Further, Thomas contests the court's finding that a scale might feel similar to a small bullet or a gun and argues that "a team of drug agents" searching the apartment due to a domestic violence assault investigation indicates that the plain view claim is pretextual.

[¶38]  On a motion to suppress, "[o]ur review of a motion justice's findings of the historical facts is deferential, but when the challenge is to the legal conclusion drawn from the historical facts our review is *de novo*."  *State v. Storey*, 1998 ME 161, ¶ 8, 713 A.2d 331.  "Under the plain view doctrine, if police are lawfully in a position from which they can view an object, its incriminating character is immediately apparent, and the officers have a lawful right of access to the object, they may seize it without a warrant."  *Id.* ¶ 18 (citation omitted).

[¶39]  Thomas does not challenge that law enforcement could legally search for a firearm, ammunition, and a cell phone, and the court's finding that the warrant permitted a search for these items is supported by competent evidence.  *See State v. Dignoti*, 682 A.2d 666, 671 (Me. 1996) (determining that the requirements that "officers must not have violated the Fourth Amendment

---

[21] As in Thomas's domestic violence case, here he did not make or adequately develop on appeal any arguments under the Maine constitution.  *See State v. Thomas*, 2022 ME 27, ¶13 n.3. 274 A.3d 356.

in arriving at the place in which the evidence is in plain view" and that "the officers must have a lawful right of access to the items" were met "because the issuance of the warrant was valid and provided a lawful right of access to the items" (quotation marks and alterations omitted)).

[¶40] Competent evidence also supports the court's fact findings and its legal conclusions that ammunition can be small, that the detective permissibly searched the backpack and felt something that could have been either a firearm or ammunition, and that the detective was allowed to search the pocket that led to the discovery of the drug-related items. *See State v. Thornton*, 414 A.2d 229, 234 (Me. 1980) (explaining that the search for marijuana and cocaine was not inappropriate where the police "dismantled furniture, door casings, mouldings, light switches and chessmen" and "searched inside the refrigerator"); *Dignoti*, 682 A.2d at 671 (explaining that a septic tank was within the scope of an authorized search and that "because the officers reasonably could suspect that cocaine would be located therein, the search was not unreasonable").

[¶41] Nor did the court err in determining that once the detective opened the pocket, he could see the drugs and scale and seize them. *See Thornton*, 414 A.2d at 234 ("The mescaline, amphetamines, and hashish were lawfully seized in the course of executing the warrant because they were inadvertently

discovered in plain view while the police were lawfully searching for marijuana and cocaine, and there was probable cause to believe that those substances were evidence of crime." (citation omitted)); *Storey*, 1998 ME 161, ¶ 18, 713 A.2d 331 (stating that "when [the agent] opened the inner vial and immediately recognized the smell of hashish oil, that recognition made its seizure as contraband permissible under the plain-view doctrine"). In light of the circumstances here and our Fourth Amendment jurisprudence, as set out above, we also affirm the court's denial of Thomas's second motion to suppress.

## B. Discovery Violations

[¶42] Thomas contends that the State's multiple alleged discovery violations denied his right to a fair trial. Thomas argues that in the order dated April 23, 2021, the court (*Stanfill, J.*) arbitrarily treated the two cell phones turned over to the New York City police department as evidence destroyed while in the State's possession;[22] that there was no discussion in the order "of *any* efforts by the State to retrieve" the phones; and that the court did not discuss why the "phones could not be retrieved from New York" or provide a course of action to retrieve the phones. Thomas also contends that the court

---

[22] We reject this argument. We considered the court's order dated April 23, 2021, in Thomas's appeal of his domestic violence case, and analyzed the same claims as if the phones were destroyed. *See Thomas*, 2022 ME 27, ¶¶ 7, 14-18, 274 A.3d 356.

(*Stewart, J.*) "gave short shrift to" Thomas's November 15, 2021, motion regarding the seized coat and two cell phones when the court concluded that Thomas's objection to the coat's admissibility was not timely raised in a motion to suppress. Thomas contends that "it remains unclear from the record why the Court just did not simply order the production of this evidence."

[¶43] The State argues, inter alia, that we previously addressed the discovery issue relating to the cell phones in Thomas's domestic violence case;[23] that the coat had no apparent exculpatory value when it was turned over to the New York City police department and the police did not act in bad faith; and that the court thus did not abuse its discretion in declining to sanction the State.

[¶44] "Although prosecutors have a constitutional duty to preserve material evidence to protect a criminal defendant's right to a fair trial, the defendant bears the burden of proving a violation of his constitutional rights." *Thomas*, 2022 ME 27, ¶ 14, 274 A.3d 356 (quotation marks omitted). "We have instructed that courts undertake a bifurcated analysis" with respect to

---

[23] We conclude that our prior opinion does not preclude our consideration of Thomas's appeal on this issue. Although the prior appeal related to the same order at issue in this appeal, the cases involve different charges and, for example, any apparent or material exculpatory evidence may differ between the two cases. *See Gardner v. Greenlaw*, 2022 ME 53, ¶¶ 8 & n.8, 9, 284 A.3d 93; *see also State v. Hughes*, 2004 ME 141, ¶¶ 5-6, 863 A.2d 266 (considering the collateral estoppel branch of the res judicata doctrine in the criminal context).

destroyed evidence and determine first "whether the evidence possessed an exculpatory value that was apparent before the evidence was destroyed." *Id.* (quotation marks omitted). If "the exculpatory value of the evidence was not apparent at the time of its loss or disappearance, the defendant cannot establish a constitutional deprivation without proof that the State also acted in bad faith in failing to preserve the evidence."[24] *Id.* (quotation marks omitted).

[¶45] We have "recognized that the proper way to challenge the failure to preserve evidence is through a motion to suppress" and accordingly "we review the factual findings underlying the trial court's ruling for clear error and the court's legal conclusions de novo." *State v. Cote*, 2015 ME 78, ¶ 9 & n.2, 118 A.3d 805; *see also State v. Wai Chan*, 2020 ME 91, ¶¶ 13, 19-21, 236 A.3d 471.

[¶46] The court (*Stanfill, J.*) did not err in concluding that the phones did not have apparent exculpatory value before Maine law enforcement turned the phones over to the New York City police department. In his argument, Thomas now contends only that the cell phones "contained *potentially* exculpatory text

---

[24] If, on the other hand, the exculpatory value of the evidence was apparent before the evidence was destroyed, "then the defendant must show only that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Thomas*, 2022 ME 27, ¶ 14, 274 A.3d 356 (quotation marks omitted).

26

messages."[25] Nor did the court clearly err in finding that Thomas had failed to prove that the State acted in bad faith in providing the phones to the New York City police department given the dearth of evidence presented to support that claim.

[¶47] We also affirm the conclusion by the court (*Stewart, J.*) that Thomas's motion concerning the coat was untimely. Although Thomas's motion requests dismissal of the indictment, it alleges a failure to preserve evidence, because Thomas concedes that Maine law enforcement no longer has the coat. "[T]he proper way to challenge" such a failure "is through a motion to suppress." *Cote*, 2015 ME 78, ¶ 9 n.2, 118 A.3d 805.[26]

[¶48] Under M.R.U. Crim. P. 41A(b), a motion to suppress evidence must be "filed within the time specified in Rule 12(b)(3)." Pursuant to M.R.U. Crim. P. 12(b)(3)(A), "motions seeking discovery pursuant to court order

---

[25] Thomas has otherwise alleged in his motions that the phones contained evidence that would discredit potential witnesses and messages "crucial to [his] defense that the drugs in question did not belong to him."

[26] In *Cote*, "Cote originally raised the issue of the missing recording in a motion to dismiss, but the trial court correctly recognized that the proper way to challenge the failure to preserve evidence is through a motion to suppress, and stated that its order should therefore be construed as a denial of a motion to suppress. At trial, the court similarly indicated that a motion to dismiss was not a proper vehicle for relief based on the destruction of evidence and suggested that discovery sanctions might be more appropriate." *State v. Cote*, 2015 ME 78, ¶ 9 & n.2, 118 A.3d 805 (citations omitted). When Cote did not suggest any sanction, the court denied the motion to dismiss and any motion for sanctions. *Id*. As in *Cote*, Thomas presented his motion to dismiss regarding the failure to preserve the coat, which the trial court then treated like a motion to suppress.

under Rules 16 and 16A" and "motions to suppress evidence . . . shall be served upon the opposing party, but not filed with the court, at least 7 days before the date set for the dispositional conference under Rule 18," and if the dispositional conference does not resolve the matter, "the motions shall be filed with the court no later than the next court day following the dispositional conference." A court "may entertain the motion" beyond this timeframe "[f]or good cause shown." M.R.U. Crim. P. 41A(b).

[¶49] Here, dispositional conferences were held on January 22, 2021, and March 16, 2021, after which Thomas filed his first motion to suppress. Thomas filed his discovery motion concerning the coat and cell phones on November 15, 2021, despite previously filing multiple motions to suppress and discovery motions regarding other destroyed evidence. The court did not err or abuse its discretion in dismissing Thomas's motion as untimely.[27] *See State*

---

[27] Thomas makes several arguments regarding the State's discovery failures as to the missing video, witness list, and text messages that were produced. For these contentions, Thomas does not include argument regarding how the court erred or abused its discretion in its orders and rulings on these issues, nor does Thomas include legal support in his argument section regarding discovery or indicate the specific prejudice that Thomas's case suffered as a result of these alleged violations.

Thomas failed to adequately develop and has therefore waived these remaining arguments. *See Mehlhorn v. Derby*, 2006 ME 110, ¶¶ 9, 11, 905 A.2d 290 (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quotation marks omitted)); Alexander, *Maine Appellate Practice* § 404 at 242 (6th ed. 2022). Regardless, the court did not err or abuse its discretion regarding these discovery rulings. *See, e.g.*, *Thomas*, 2022 ME 27, ¶¶ 14-18, 274 A.3d 356; *State v. Dolloff*, 2012 ME 130, ¶ 24, 58 A.3d 1032 ("The judicial response to alleged discovery violations is also reviewed for an abuse of discretion."); *State*

*v. Nigro*, 2011 ME 81, ¶ 28, 24 A.3d 1283; *State v. Kennedy*, 2002 ME 5, ¶¶ 6-7, 788 A.2d 174.

## C. Confrontation Clause

[¶50] Thomas contends that the court erred in allowing Chemist Two's testimony regarding "the hearsay certificate of the otherwise original chemist," Chemist One, because there was no finding that Chemist One was unavailable and that this violated his confrontation right. The State responds that Chemist Two had "originally conducted a technical review of [Chemist One's] work . . . at the time of the original testing in the fall of 2020"; that Chemist Two independently reviewed the data and provided an independent opinion that the samples contained fentanyl "in preparation for his testimony at trial"; that experts can "rely on 'facts or data' in reaching their opinion that might not be otherwise admissible at trial"; and that Chemist Two's live testimony satisfied Thomas's confrontation right.

[¶51] "The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him." *Smith v. Arizona*, 602 U.S. 779, 783 (2024); U.S. Const. amend. VI. "The Clause bars the admission at trial of 'testimonial statements' of an absent witness unless [that

---

*v. Silva*, 2012 ME 120, ¶ 8, 56 A.3d 1230; *cf. State v. Gagne*, 2017 ME 63, ¶ 38, 159 A.3d 316. *See supra* §§ 11-26.

witness] is 'unavailable to testify, and the defendant has had a prior opportunity' to cross-examine [the witness]." *Smith*, 602 U.S. at 783 (alteration omitted) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)).

[¶52]  The prohibition against testimonial statements "applies in full to forensic evidence" and to "forensic reports."  *Smith*, 602 U.S. at 783, 785. However, "the Clause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted."  *Id.* at 785 (quotation marks omitted).  "So a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing."  *Id.* at 783.  "We review de novo the impact of the admission of testimony on the constitutional right to confront witnesses."  *State v. Judkins*, 2024 ME 45, ¶ 11, 319 A.3d 443 (quotation marks omitted).

### 1.    Hearsay

[¶53]  In *Smith v. Arizona*, a case decided after the judgment of conviction here, the Supreme Court determined that "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts."  602 U.S. at 795.

[¶54]   In *Smith*, the state sent seized items "to a crime lab run by the Arizona Department of Public Safety (DPS) for a 'full scientific analysis.'" *Id.* at 789.  "The State's request identified Smith as the individual 'associated' with the substances, listed the charges against him, and noted that 'trial had been set.'" *Id.* at 790 (alterations omitted).  An analyst spoke with prosecutors about what items needed to be examined and ran the tests requested.  *Id.*  The analyst prepared typed notes and a signed report, on DPS letterhead, regarding her testing.  *Id.*  Her "notes documented her lab work and results" and disclosed for each of the items a description, a weight, how the weight was measured, the testing she performed, the results of the testing, and a conclusion about the identity of the item.  *Id.*  "The signed report then distilled the notes into two pages of ultimate findings, denoted 'results/interpretations,'" which included that each item contained a usable quantity of methamphetamine, marijuana, or cannabis.  *Id.*  At trial, the State did not call the analyst, who no longer worked at the lab, and instead called a forensic scientist as a substitute witness.  *Id.*  The substitute expert "had no prior connection to the Smith case," and he prepared for trial by reviewing the analyst's notes and report.  *Id.* at 791.  In his testimony, he referred to the notes and report, and he "related what was in them, item by

item by item."[28] *Id.* After telling the jury what the records conveyed, he "offered an 'independent opinion'" identifying the items as methamphetamine, marijuana, or cannabis. *Id.* Although the expert was "familiar with the lab's general practices, [he] had no personal knowledge about [the analyst's] testing of the seized items." *Id.* at 796. Instead, his knowledge "came only from reviewing [the analyst's] records." *Id.*

[¶55] In analyzing whether "an out-of-court statement was admitted for its truth" in this scenario, the Supreme Court concluded that "truth is everything when it comes to the kind of basis testimony presented here." *Id.* at 794-95. "[T]he truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion." *Id*. at 795*.*

[¶56] Here, the facts are similar to, though distinct from, *Smith*. The State alleged that Chemist One analyzed the substances and concluded that they were fentanyl and determined the weight, but that Chemist One then moved out of state. The State sought to offer Chemist Two's testimony, for which he was

---

[28] "As to each, he described the specific 'scientific methods' [that the analyst] had used to analyze the substance (e.g., a microscopic examination, a chemical color test, a gas chromatograph/mass spectrometer test). And as to each, he stated that the testing had adhered to 'general principles of chemistry,' as well as to the lab's 'policies and practices'; so he noted, for example that [the analyst] had run a 'blank' to confirm that testing equipment was not contaminated." *Smith v. Arizona*, 602 U.S. 779, 791 (2024) (alteration and citations omitted).

subject to cross-examination, regarding the weight of the two items and his conclusion that they contained fentanyl. Unlike in *Smith*, the court here found that Chemist Two's testimony was based on his independent analysis of data and that Chemist Two had conducted a technical review of Chemist One's work. Chemist Two testified that he compared the data to a known profile of fentanyl and independently concluded that the data and the known profile matched. The court had determined before Chemist Two testified that he could not testify regarding the precise steps Chemist One took.

[¶57] Yet the court had also determined that Chemist Two's testimony could rely on Chemist One's file notes, which contained the test results providing a profile, which Chemist Two then compared to the known profile for the substance. This reliance on Chemist One's file notes, test results, and sample profile, all generated by and based on Chemist One's actions, carries the same problem identified by the Supreme Court in *Smith*. *See id.* at 798 (stating that a substitute expert "could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what [the analyst] had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results").

[¶58]  The facts in this case are akin to those in *Williams v. Illinois*, 567 U.S. 50, 56 (2012), a case in which the Supreme Court concluded that an expert could "testif[y] that a DNA profile produced by [a nontestifying] outside laboratory . . . matched a profile produced by the state police lab using a sample of petitioner's blood."  However, the Supreme Court abrogated *Williams* in *Smith*. *Smith*, 602 U.S. at 786-93.  The Supreme Court in *Smith* explained that the expert in *Williams* "had no first-hand knowledge of how the private lab had produced its results; [the expert] did not even know whether those results actually came from [the victim].  But [the expert] spoke repeatedly about comparing [the defendant's] DNA to the DNA 'found in [the victim's] vaginal swabs.'" *Id.* at 787. "So in addition to describing how [the expert] discovered a match, [the expert] became the conduit for what a different analyst had reported—that a particular DNA profile *came from* [the victim's] swabs." *Id.* (emphasis added).  Similarly, here Chemist Two relied on Chemist One's file notes for his independent review, and his testimony relied on the data Chemist One generated from the substances, and thus Chemist Two was a "conduit" for Chemist One's report that the particular data came from the samples seized from Thomas.  Chemist Two relied on the truth of the notes and the generated data, and his testimony regarding his independent review of that data was

offered for the truth of the results of the forensic testing that Chemist One had performed. *Cf. id.* at 800-01.

[¶59]  Further, Chemist Two testified about the weight of the samples. According to the normal processes of the lab about which he testified, Chemist One's data was taken from a "weight set," and Chemist Two's review appeared to include minimal, if any, independent scrutiny. Instead, Chemist Two's testimony relied on Chemist One's notes to determine the weight of the samples. There was no further calculation or analysis by Chemist Two to determine the weight; rather, Chemist Two accepted the weight as determined by Chemist One and testified to that weight for the truth of the matter asserted, i.e., that the two samples weighed the amounts that Chemist One found them to weigh. *See Smith*, 602 U.S. at 800 (explaining that it was impermissible for the State to use the expert "to relay what [the analyst] wrote down," including the "precautions (she said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained"); *State v. Mangos*, 2008 ME 150, ¶ 4, 957 A.2d 89 (vacating a conviction in part due to a violation of the defendant's confrontation right where the nontestifying chemist's supervisor "testified to the procedure used for swabbing articles of clothing . . . based on [the chemist's] report"). We conclude that Chemist Two's

testimony relied on the truth of out-of-court statements and thus turn to whether those statements were testimonial. *See Smith*, 602 U.S. at 800; *Judkins*, 2024 ME 45, ¶ 16, 319 A.3d 443.

### 2. Testimonial

[¶60] "'Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.'" *State v. Mitchell*, 2010 ME 73, ¶ 41, 4 A.3d 478 (quoting *Crawford*, 541 U.S. at 68-69). "A testimonial statement is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Judkins*, 2024 ME 45, ¶ 12, 319 A.3d 443 (quotation marks omitted).

[¶61] We have previously determined that "a lab certificate identifying a controlled substance" is testimonial. *State v. Jones*, 2018 ME 17, ¶ 12, 178 A.3d 481 (explaining that the lab certificate "identifies, after testing, that the substance obtained . . . was 136.1 milligrams of methamphetamine"; the certificate is "signed and attested to by a State-certified chemist, who prepared the analysis at the [MDEA's] request"; and the certificate's admission "triggers the protections of the Confrontation Clause"). Here, the court determined that

the State was not attempting to offer Chemist One's certificate and that the notes that Chemist Two relied on were signed and dated but not testimonial.

[¶62] The Supreme Court uses the primary-purpose test to determine whether a statement is testimonial:

> To implicate the Confrontation Clause, a statement must be hearsay ("for the truth") and it must be testimonial—and those two issues are separate from each other. The latter, this Court has stated, focuses on the "primary purpose" of the statement, and in particular on how it relates to a future criminal proceeding. A court must therefore identify the out-of-court statement introduced, and must determine, given all the "relevant circumstances," the principal reason it was made.

*Smith*, 602 U.S. at 800-01 (citations omitted). The Court also "offer[ed] a few thoughts . . . about the questions the state court might usefully address if the testimonial issue remains live." *Id.* at 801. The Court directed state courts first "to consider exactly which of [the nontestifying lab analyst's] statements are at issue" and next to "address[] the statements' primary purpose—why [the nontestifying lab analyst] created the report or notes" by "consider[ing] the range of recordkeeping activities that lab analysts engage in. . . . To [be testimonial], the document's primary purpose must have 'a focus on court.' And again, the state court on remand should make that assessment as to each record whose substance [the testifying witness] conveyed." *Id.* at 801-02 (citation omitted); *cf. Michigan v. Bryant*, 562 U.S. 344, 374 (2011) ("We reiterate,

moreover, that the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency." (quotation marks omitted)).[29]

[¶63]  Here, the statements at issue are Chemist One's worksheet and notes regarding the weights of the substances, which Chemist Two relied on for his independent review.[30]  The court declined to make a finding that Chemist One was unavailable to testify, and Thomas had not had a prior opportunity to cross-examine Chemist One.  Therefore, Thomas's confrontation rights would

---

[29] *Bryant* involved the police responding to the call that a man had been shot and found bleeding in the gas station parking lot: "they did not know who [the shooting victim] was, whether the shooting had occurred at the gas station or at a different location, who the assailant was, or whether the assailant posed a continuing threat to [the victim] or others." *Michigan v. Bryant*, 562 U.S. 344, 371, (2011) (quotation marks omitted).  After examining the circumstances of the encounter between the police and the victim, as well as their statements and actions, the Court concluded that the "primary purpose of the [police] interrogation was to enable police assistance to meet an ongoing emergency," and that the victim's identification and description of the assailant was not testimonial hearsay.  *Id.* at 377-78 (quotation marks omitted).  Thus, the Confrontation Clause did not bar the admission of victim's statements at Bryant's trial.  *Id.* at 378.

[30] Chemist Two's testimony about the technical review he performed in the fall of 2020 is not at issue for the purposes of the analysis because the statements that Chemist Two's technical review was based on are machine-generated data from the gas chromatograph and mass spectrometer and because the court determined that Chemist Two could not testify regarding the precise steps Chemist One took in analyzing that data.  *See, e.g.*, *State v. Beeler*, 2022 ME 47, ¶ 26, 281 A.3d 637 ("Admission of a breath test certificate without witness testimony does not offend the federal Confrontation Clause where the certificate is a machine-generated result."); *United States v. Lamons*, 532 F.3d 1251, 1264 (11th Cir. 2008) ("The exemption of machine-generated statements from the purview of the Confrontation Clause also makes sense in light of the purposes of confrontation."); *State v. Ziegler*, 855 N.W.2d 551, 556 (Minn. Ct. App. 2014) ("Like the circuit courts, we agree that machine-generated 'statements' are exempt from the purview of the Confrontation Clause because the Confrontation Clause is concerned with the statements of human witnesses.").

be violated if the statements Chemist Two relied on had the primary purpose of preparing for litigation; in other words, for Chemist Two's testimony to be admissible, the statements on which his testimony was based must not have had a "focus on court." *See Smith*, 601 U.S. at 801-02.

[¶64] Chemist Two testified that Chemist One's notes were signed and dated to signify who completed the testing and the date of completion and that the notes were not signed under oath, nor was there a sworn statement, which suggests a lack of the formality that is associated with notes prepared for a trial. *See Crawford*, 541 U.S. 36, 51-52 (providing examples of testimonial statements including "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions" (quotation marks omitted)). *But see Bryant*, 562 U.S. at 366 ("Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution, informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." (citation and quotation marks omitted)).

[¶65]   We have previously indicated, however, that "[t]estimonial evidence includes statements made for the purpose of police investigation." *Mangos*, 2008 ME 150, ¶ 13, 957 A.2d 89 (stating that a chemist's "statement in her report that she had examined the t-shirt and bandanna and created the swabs from those items is testimonial because she made it in furtherance of a police investigation"); *cf. Jones*, 2018 ME 17, ¶ 12 n.3, 178 A.3d 481 (listing cases in which "the evidence at issue was not testimonial").  At trial, the lab's evidence technician testified that law enforcement indicated that the samples should be tested as a rush job.  We conclude that Chemist One's statements were testimonial because they were prepared for the purpose of a police investigation.  Therefore, Chemist Two's testimony regarding Chemist One's worksheet and notes that indicated the weight of the substances violated Thomas's confrontation right.

### 3.    Harmless Error

[¶66]  We next consider whether the error in admitting Chemist Two's testimony was harmless.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  "The correct inquiry is whether . . . a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily

accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

[¶67]  Here, we are unable to determine beyond a reasonable doubt that Chemist Two's testimony did not affect the verdict. There was no other testimony regarding the specific weights of the substances that Chemist One tested, and here the weights were legally significant, *see* 17-A M.R.S. § 1105-A(1)(M), and important to the State's case, *see Van Arsdall*, 475 U.S. at 684.[31] We therefore vacate the judgment. In light of this determination, we need not address the remaining issues that Thomas raises on appeal. *See Judkins*, 2024 ME 45, ¶ 1 n.1, 319 A.3d 443.

---

[31] The State was relying in part on the drugs' weight to prove the charges, particularly for Count 2. There was other testimony and exhibits that may have allowed the jury to determine beyond a reasonable doubt that the weight exceeded the statutory minimum amount of six grams, *see* 17-A M.R.S. § 1105-A(1)(M) (2024), but the majority of the evidence related to the *gross weight* of the five bags of drugs.

The entry is:

> Judgment vacated.  Remanded for further
> proceedings consistent with this opinion.

---

James P. Howaniec, Esq. (orally), Lewiston, for appellant Clifton Thomas

Aaron M. Frey, Attorney General, and John P. Risler, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2020-2253
FOR CLERK REFERENCE ONLY