MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2025 ME 52
Docket:      Pen-24-248
Argued:      April 9, 2025
Decided:     June 17, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

STATE OF MAINE

v.

ROCHELLE GLEASON


MEAD, J.

[¶1]   Rochelle Gleason appeals from a judgment of conviction of aggravated trafficking of a scheduled drug that in fact caused the death of a person (Class A), 17-A M.R.S § 1105-A(1)(K) (2025), entered by the trial court (Penobscot County, *Mallonee, J.*) after a jury trial.  On appeal, Gleason raises an issue concerning her Sixth Amendment right to confront the people who performed several toxicology tests that served as the basis for an expert toxicologist's opinion testimony.  The United States Supreme Court's decision in *Smith v. Arizona*, 602 U.S. ---, 144 S. Ct. 1785 (2024), which was issued during the pendency of this appeal,[1] did away with a line of reasoning that the trial

---

[1]  The appeal has been pending since May 16, 2024.  The Supreme Court issued its decision in *Smith v. Arizona*, 602 U.S. ---, 144 S. Ct. 1785 (2024), on June 21, 2024.  In *Griffith v. Kentucky*, the Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied

court relied upon when it admitted the expert toxicologist's testimony. We vacate the judgment and remand for a new trial.

## I. BACKGROUND

### A. Factual Background

[¶2] Viewing the evidence in the light most favorable to its verdict, the jury rationally could have found the following facts. *See State v. Fay*, 2015 ME 160, ¶ 2, 130 A.3d 364.

[¶3] In October 2021, Gleason and the decedent communicated regularly regarding the purchase of fentanyl and heroin, often using slang like "fingy," "fetty," "brown," and "down." On October 16, 2021, the decedent messaged Gleason asking to purchase more drugs. Gleason responded with a voice message for the decedent, stating that she had some "dark, dark shit that is expensive but worth it." She continued that she had acquired some "fire, harsher shit" and added that she could get him $40 worth. The decedent agreed.

[¶4] Later that evening, the decedent drove with his twelve-year-old daughter to Third Street in Bangor. His daughter remained in the car while he

---

retroactively to all cases, state or federal, pending on direct review or not yet final." 479 U.S. 314, 328 (1987); *accord State v. Labbe*, 2024 ME 15, ¶ 39, 314 A.3d 162. Because this case is on direct review, the rule announced in *Smith* applies retroactively in this case.

met with Gleason. His daughter observed the decedent exchange money for something. The decedent returned home and said goodnight to his daughter. He then consumed the fentanyl that he had purchased from Gleason, along with a nonscheduled but potentially lethal fentanyl metabolite called kratom or mytragynine. The decedent died of acute intoxication shortly after consuming the drugs.

[¶5] The Maine Office of the Chief Medical Examiner sent a sample of the decedent's blood to the NMS Forensic Toxicology Laboratory in Pennsylvania. At the lab, several lab employees conducted a series of tests on the sample. The tests included two separate screening tests that screened for a wide variety of compounds and a confirmatory test to quantify any substance for which the screening produced positive results. The lab, at the request of the Chief Medical Examiner, also ran confirmatory tests specifically aimed at determining the presence and quantity of fentanyl and kratom in the decedent's blood. Two different lab employees reviewed the results of the tests to determine whether the instruments were accurate, there were no anomalies, and appropriate protocols were being followed. After each test, a lab employee exported the data from the testing instruments to a computer. A forensic toxicologist who also works for NMS Laboratory, Chelsea Deisher, then conducted another

4

review of the data and the documentation. Deisher had a record of everyone who prepared the samples and conducted a review of the data, but she did not have a record of the employees who had operated the instruments during the tests or the employees who had exported the data from the instrument to the computer. Relying upon the results and data obtained by the other employees, Deisher then developed a toxicology report that revealed that the decedent's blood contained 26 nanograms per milliliter of fentanyl, 1.8 nanograms per milliliter of norfentanyl (a breakdown product of fentanyl), and 22 nanograms per milliliter of kratom.

## B. Procedural History

[¶6] On September 28, 2022, the State charged Gleason by complaint with aggravated trafficking of a scheduled drug that in fact caused the death of a person (Class A), 17-A M.R.S. § 1105-A(1)(K). Gleason pleaded not guilty.

[¶7] The court held a five-day trial from April 29 to May 3, 2024. At trial, Deisher testified for the State about the results of several tests. Deisher explained that she had not actually conducted the tests but rather had reviewed the data and documentation and had analyzed the results. Gleason objected to this testimony and moved for a mistrial on the ground that the testimony violated her Sixth Amendment Confrontation Clause right because she did not

have an opportunity to cross-examine the actual testers to question whether the test sequences and procedures were properly followed. After hearing additional testimony outside of the presence of the jury, the court allowed Deisher to continue testifying.

[¶8] Later, a deputy chief medical examiner testified that the results that Deisher discussed during her testimony indicated that the decedent had a toxic level of fentanyl in the blood and died of acute intoxication due to the combined effects of fentanyl and kratom.

[¶9] The jury returned a verdict of guilty. On May 16, 2024, the court held a sentencing hearing at which it sentenced Gleason to eighteen years' imprisonment, with all but eight years suspended, and four years of probation.

[¶10] Gleason timely appealed. *See* M.R. App. P. 2B(b)(1); 15 M.R.S. § 2115 (2025).

## II. DISCUSSION

[¶11] The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The federal Confrontation Clause applies to the states through the Fourteenth Amendment. *Melendez-Diaz v. Massachusetts*, 557 U.S.

6

305, 309 (2009); *accord State v. Jones*, 2018 ME 17, ¶ 8, 178 A.3d 481. "We review de novo the impact of the admission of testimony on the constitutional right to confront witnesses." *State v. Judkins*, 2024 ME 45, ¶ 11, 319 A.3d 443 (quotation marks omitted).

[¶12]  The Confrontation Clause operates by prohibiting the "admission of testimonial statements of a witness who did not appear at trial unless [that witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  The Confrontation Clause applies only to statements that are both (1) hearsay—meaning out-of-court statements offered "to prove the truth of the matter asserted," *id.* at 59 n.9, 60; *see* M.R. Evid. 801(c), and (2) testimonial.  *See State v. Lovell*, 2022 ME 49, ¶ 13, 281 A.3d 651.

## A.    Hearsay

[¶13]   In analyzing the hearsay prong of the Confrontation Clause analysis, a court "must identify the role that a given out-of-court statement . . . served at trial." *Smith*, 602 U.S. at ---, 144 S. Ct. at 1797.  The Confrontation Clause protections extend in full to forensic evidence.  *Id.* at ---, 144 S. Ct. at 1791.  In *Smith*, the Supreme Court clarified that this means that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court

statements to prove the results of forensic testing." *Id.* In reaching its holding, the Court provided a new rule: "If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at ---, 144 S. Ct. at 1798.

[¶14] In *Smith*, the prosecution sent items suspected of being illicit drugs to a crime lab for a full scientific analysis. *Id.* at ---, 144 S. Ct. at 1795. An analyst ran several tests, prepared notes documenting her lab work and results, and issued a report that distilled her notes into two pages of ultimate findings, stating that the items included useable quantities of methamphetamines, marijuana, and cannabis. *Id.* At trial, the prosecution called a forensic scientist, who had no prior connection to the case but was familiar with the lab's general practices, to offer an "independent opinion" based entirely on his review of the lab analyst's notes and report. *Id.* at ---, 144 S. Ct. at 1795-96, 1799. The forensic scientist testified regarding the procedures and tests the analyst used and then related the content of the notes and the report "item by item by item." *Id.* at ---, 144 S. Ct. at 1795. He then opined that the tested substances included useable quantities of methamphetamines, marijuana, and cannabis. *Id.* at ---, 144 S. Ct. at 1796.

8

[¶15]  The *Smith* Court found it problematic that the forensic expert "could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what the [the analyst] had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results." *Id.* at ---, 144 S. Ct. at 1799-1800.  The Court reasoned that the prosecution had essentially used the forensic scientist as a "mouthpiece" for the analyst's lab work so that the jury would believe the truth of the results.  *Id.* at ---, 144 S. Ct. at 1800-01. Accordingly, the Court held that because the testifying forensic scientist's opinion would be of little to no value to the prosecution if the underlying report and notes were not true, the contents of the report and notes were being offered for their truth, implicating the Confrontation Clause.  *Id.* at ---, 144 S. Ct. at 1799-1800.

[¶16]  The new rule did away with the so-called "not for the truth" rationale, which allowed experts, under evidence rules, to disclose underlying facts and data without implicating the Confrontation Clause because the underlying facts and data were not being admitted for the truth but rather for the purpose of explaining the basis of an opinion. *Id.* at ---, 144 S. Ct. at 1793-94. For example, in *Williams v. Illinois*, using vaginal swabs sent by the state police,

a private lab provided the police with a DNA profile. 567 U.S. 50, 61 (2012). A state analyst then checked that DNA profile against a police department's database, finding that the DNA matched the profile of the defendant. *Id.* at 61-62. The prosecution called only the state analyst, who had no first-hand knowledge of how the lab had produced its results, to offer the expert opinion that the DNA profile matched the defendant. *Id.* at 61-62. A plurality of the Supreme Court held that the expert's opinion testimony did not implicate the Confrontation Clause because the out-of-court statement (the DNA profile) was not admitted for its truth but rather to explain the basis of the opinion. *Id.* at 57-58, 71, 78. In criticizing the plurality's approach in *Williams*, the Court in *Smith* explained that "[the state analyst] became the conduit for what a different analyst had reported—that a particular DNA profile came from [the victim's] vaginal swabs." *Smith*, 602 U.S. ---, 144 S. Ct. at 1793.

[¶17] Our case law had also recognized the "not for the truth" rationale. In both *State v. Mitchell*, 2010 ME 73, ¶ 20, 4 A.3d 478, and *State v. Mercier*, 2014 ME 28, ¶ 5, 87 A.3d 700, the prosecution called medical experts who gave opinions concerning the cause of the victims' injuries based entirely on autopsy reports authored by people whom the defendants did not have an opportunity to cross-examine. In both cases, we held that the Confrontation Clause was not

implicated because the experts' testimony relaying the contents of the autopsy reports to the juries were received in evidence not for their truth but rather to help explain the bases of the experts' opinions. *Mitchell*, 2010 ME 73, ¶ 47, 4 A.3d 478; *Mercier*, 2014 ME 28, ¶¶ 10, 13-15, 87 A.3d 700. The Court in *Smith* explicitly mentioned our decision in *Mercier* as an example of a state court using the "not for the truth" reasoning that the Court found problematic.[2] *Smith*, 602 U.S. at ---, 144 S. Ct. at 1794 n.2.

[¶18]  In a recent case applying the rule announced in *Smith*, *State v. Thomas*, 2025 ME 34, ¶¶ 56-59, --- A.3d ---, we held that a testifying chemist's opinion concerning the identity and weight of several chemical substances was inadmissible hearsay for the purposes of the Confrontation Clause analysis.[3]  In

---

[2] We note, however, that our pre-*Mercier* jurisprudence is in accord with *Smith*. In *Henricksen v. Cameron*, 622 A.2d 1135, 1143 (Me. 1993), one doctor testified about the contents of a report of another doctor that the testifying doctor had reviewed in formulating his opinion. We held that the contents of the other doctor's report were inadmissible:

> Testimony regarding the *substance* of Dr. Voss's report, however, is not necessary to establish factual foundation under Rule 703 and remains hearsay not within any exception. *See* M.R. Evid. 801–804. Rule 703 does not make the substance of Dr. Voss's report admissible and, therefore, admitting Dr. Collins' testimony about the substance of the report was error.

*Id.* at 1144.

[3] The Court of Appeals for the First Circuit has also had an opportunity to issue a Confrontation Clause decision following the Supreme Court's decision in *Smith v. Arizona* in an appeal from a federal district court's denial of a petition for habeas corpus relief. *See Watson v. Edmark*, 118 F.4th 456 (1st Cir. 2024). Like this case, *Watson* concerned a toxicologist's expert testimony based on data and test results generated by lab analysts that were not present at trial. *Id.* at 458. In affirming the district court's grant of summary judgment, the First Circuit, applying standards of review unique to habeas corpus proceedings, determined that the petitioner had failed to rebut the presumption of

that case, an expert chemist testified that he conducted a "technical review" of another chemist's work, "retracing the steps" of the other chemist to ensure that information was accurate and consistent. *Id.* at ¶¶ 29-30 (quotation marks omitted). The expert chemist also testified that he had conducted an "independent review" of the data, using the other chemist's handwritten notes and comparing the data produced by the other chemist to a known profile of fentanyl to "independently" conclude that the data and the known profile matched. *Id.* ¶ 31. We held that the prosecution used the expert chemist as a "conduit" for the other chemist's statement "that the particular data came from the samples seized from [the defendant]" and that the expert chemist relied on the truth of the notes and the data generated by the other chemist. *Id.* ¶ 58 (quotation marks omitted). Accordingly, we held that the forensic scientist's testimony had conveyed the out-of-court statements for their truth and therefore constituted hearsay for the purposes of the Confrontation Clause analysis. *Id.* ¶ 59.

---

correctness of factual findings by the state court. *Id.* at 459-61. The court held that the petitioner had not met his burden of showing that there could be "room for fairminded disagreement" as to whether an expert forensic toxicologist was an incompetent witness. *Id.* at 461-62. Finally, the court held that the petitioner had failed to address whether the data and test results relied on by the toxicologist constituted "statements of an absent analyst." *Id.* at 462 n.5.

[¶19]   Here, the facts are most akin to those in *Thomas*, 2025 ME 34, ¶¶ 29-31, --- A.3d ---.   Like the expert chemist in *Thomas*, the forensic toxicologist who testified at trial, Deisher, conducted a technical review of the data and the documentation in the case, which included notes made by other lab employees concerning anomalies in the data and whether protocols had been followed.  Deisher did not prepare the samples, run the tests, or export the data from the instruments to the computer; nor did she personally observe other lab employees doing those things.  Using the data generated by others, Deisher conducted an independent review to develop a toxicology report. Deisher acknowledged that her independent review "rel[ied] upon the assumption that all the testing sequences and processes were properly followed."  Deisher also recognized that the data she reviewed was the product of judgments made by other reviewers and lab employees.  As did the expert chemist in *Thomas*, Deisher relied on the truth of the documentation and the data that had been generated by others.  Moreover, Deisher could only assume that the samples tested by the other lab employees came from the victim.

[¶20]   In allowing the witness to testify over Gleason's Confrontation Clause objection, the trial court, citing Maine Rule of Evidence 703, reasoned that "[t]his is clearly the type of information upon which experts rely in issuing

their opinions. . . . [Deisher] is a live witness with technical expertise within an organization who has gathered together information from a number of different actors within that organization, and she is in a position both critically to assess it, and to explain it, and to be subjected to cross-examination on it." The trial court's reasoning is an exemplar of the "not for the truth" rationale that was rejected in *Smith*, because it suggests that the underlying out-of-court statements (the data and the documentation) were not being admitted for their truth but to explain the basis of the opinion.

[¶21] Furthermore, Deisher's expert opinion testimony presents the same Confrontation Clause problem identified by the *Smith* Court. The State essentially used Deisher as a "mouthpiece" to convey that other lab employees had precisely followed procedures and protocols so that the jury would believe the truth of the lab results. *See Smith*, 602 U.S. at ---, 144 S. Ct. at 1800-01 (holding that the prosecution impermissibly used an expert "to relay what [the analyst] wrote down," including the "precautions (she said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained"). Gleason did not have an opportunity to cross-examine the other lab employees concerning the procedures that they

supposedly followed or whether the samples that they tested actually came from the victim.

[¶22]  Applying the rule announced in *Smith*, we conclude that the data and record of the lab procedures are out-of-court statements being offered for their truth because if the tests did not reveal the presence of fentanyl, Deisher's expert opinion would have been of no value to the prosecution.

## B.    Testimonial

[¶23]  Having determined that the hearsay prong of the Confrontation Clause analysis has been satisfied, we would normally consider whether the statements at issue were testimonial to determine whether the Confrontation Clause has been violated.  *See Judkins*, 2024 ME 45, ¶ 12, 319 A.3d 443.  "A testimonial statement is 'typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"  *State v. Beeler*, 2022 ME 47, ¶ 21, 281 A.3d 637 (quoting *Crawford*, 541 U.S. at 551).  "In determining whether an out-of-court statement qualifies as testimonial, courts look at whether the primary purpose of the statement is to establish or prove a fact to be used later in trial."  *Id.* ¶ 22 (quotation marks omitted); *see also Smith*, 602 U.S. at ---, 144 S. Ct. at 1800-01 ("A court must . . . identify the out-of-court

statement introduced, and must determine, given all the relevant circumstances, the principal reason it was made." (quotation marks omitted)).

[¶24] This case presents an unusual procedural posture. The trial court admitted Deisher's testimony based on a rationale that was supported by case law at the time. *See Mercier*, 2014 ME 28, ¶¶ 10, 13-15, 587 A.3d 700. Because a then-existing rule of law was fully dispositive of the Confrontation Clause issue, neither the State nor the trial court reached the testimonial prong of the analysis. *Cf. State v. Wright*, 726 N.W.2d 464, 482 (Minn. 2007); *People v. Stechly*, 870 N.E.2d 333, 371 (Ill. 2007). We are a court of review, not of first view, *see In re Est. of Williams*, 141 Me. 219, 221, 41 A.2d 825, 825 (1945), and, therefore, we will not make the necessarily fact-specific initial determination as to whether the statements at issue are testimonial. *See State v. Metzger*, 2010 ME 67, ¶ 22, 999 A.2d 947 ("[W]hether [a statement] is testimonial and thus barred by the Confrontation Clause . . . is necessarily a fact-specific inquiry."). Additionally, because the parties developed their respective records based on a standard that is no longer permissible, fairness requires us to vacate the judgment of conviction and remand this case for a new trial to allow the trial court, in the first instance, to address whether the statements relied upon by the expert witness in reaching her opinion were testimonial or nontestimonial.

*See Portfolio Recovery Assocs., LLC v. Clougherty*, 2021 ME 20, ¶ 11, 248 A.3d 950 ("Because the parties developed their respective records with a different evidentiary standard in mind, fairness requires that we remand these matters for further proceedings, which may include reopening the record to allow further argument or to take new evidence.").

The entry is:

Judgment vacated.  Remanded for a new trial.[4]

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Rochelle Gleason

Aaron M. Frey, Attorney General, and Jason Horn, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2022-3059
FOR CLERK REFERENCE ONLY

---

[4] Although the Court in *Smith* remanded the case to the Arizona state courts to address the testimonial versus nontestimonial issue—apparently in the context of the existing trial record—*see Smith*, 602 U.S. at ---, 144 S. Ct. at 1801, we conclude that the better practice is to vacate the conviction and remand for a wholly new trial.  Because we do so, we do not reach the remainder of Gleason's arguments.