MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2026 ME 23
Docket:        Pen-25-24
Argued:        February 5, 2026
Decided:       March 10, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ., and HJELM, A.R.J.

## STATE OF MAINE

v.

## KENNETH RHOADES

CONNORS, J.

[¶1]  Kenneth Rhoades appeals from his judgment of conviction for operating under the influence with two previous OUI offenses within a ten-year period (Class C), 29-A M.R.S. § 2411(1-A)(B)(2), (5)(C) (2025), entered by the trial court (Penobscot County, *Szylvian, J.*) following a jury trial.  On appeal, Rhoades argues that the trial court erred in denying his motion to suppress the evidence obtained as a result of the stop of his vehicle and in admitting the results of his breath-alcohol (Intoxilyzer) test at trial.  Rhoades also asserts that the trial court erred in denying his motion for discovery sanctions.  We affirm.

# I. BACKGROUND

## A.    The Underlying Facts

[¶2]  Viewed in the light most favorable to its verdict, the jury rationally could have found the following facts beyond a reasonable doubt.  *See State v. Hall*, 2019 ME 126, ¶ 3, 214 A.3d 19.

### 1.    The Encounter

[¶3]  Just before 5:00 p.m. on September 28, 2022, an officer for the Lincoln Police Department was on duty visually monitoring traffic on Main Street when he saw a red pickup truck that he estimated was speeding.  He initiated a traffic stop.

[¶4]  The officer approached the driver's side door of the vehicle. Rhoades was the driver and only occupant of the vehicle, and his window was almost entirely closed, with an opening of only approximately three inches at the top.  The officer asked Rhoades to roll the window down, but he refused, speaking in profanities and saying that it was broken.  The officer observed Rhoades leaning away from him, toward the passenger seat, and noticed that his speech was slurred and his eyes were "bloodshot and glassy."  The officer also noticed the smell of metabolized alcohol emanating from Rhoades.

[¶5]  The officer asked Rhoades if he had been drinking, to which Rhoades responded that he had not, suggesting that the odor came from beer spilled in the truck and stating that the truck belonged to his father.  Later in their encounter, Rhoades admitted to having consumed two alcoholic beverages.

[¶6]  After further interaction with Rhoades, the officer called for backup as Rhoades was making statements that the officer found concerning.  The officer described his interaction with Rhoades as "hostile, verbal, threatening."[1]

[¶7]  When the officer returned to his cruiser to wait for dispatch's response, Rhoades exited his vehicle and approached the officer in a manner that the officer described as aggressive and threatening.  The officer instructed Rhoades to return to his vehicle and when Rhoades did not do so, the officer displayed his Taser.  Rhoades stopped, and the officer told him to get on his knees.  Rhoades did not do so but returned to his truck and leaned on it.  The officer then informed Rhoades that he would be taking him to the Lincoln police station to take an Intoxilyzer test.  The officer instructed Rhoades to sit in the back seat of the officer's cruiser and placed him in handcuffs.

---

[1] The encounter was not recorded.

4

### 2. The Breath Test

[¶8] The officer drove Rhoades to the Lincoln police station to administer an Intoxilyzer test, which the officer was certified to perform.

[¶9] Rhoades initially indicated that he was not going to take the test but subsequently submitted to the test. The officer testified as to how he administered the test, including conducting a requisite mouth check and fifteen-minute observation period, after which the officer determined that it was appropriate to continue with the test. The officer obtained a breath sample from Rhoades, which the machine indicated contained .16 grams of alcohol per 210 liters of breath.[2]

## B. Procedural Background

[¶10] The State filed a criminal complaint against Rhoades on November 21, 2022, alleging that he was operating under the influence and had two previous OUI offenses within a ten-year period (Class C), and filed an indictment on that charge on March 1, 2023. 29-A M.R.S. § 2411(1-A)(B)(2).

[¶11] A week later, Rhoades filed a motion to suppress, arguing that the officer who stopped him did not have reasonable articulable suspicion to stop

---

[2] The criminal OUI statute under which Rhoades was charged prohibits a person from operating a motor vehicle with a breath alcohol level of .08 grams per 210 liters or more. 29-A M.R.S. § 2411(1-A)(A)(2).

his vehicle and, therefore, all subsequently gathered evidence should be excluded. At the conclusion of an evidentiary hearing on Rhoades's motion to suppress in May 2023, the court (*A. Murray, J.*) denied the motion.

[¶12] The case was scheduled for trial in July 2023. In May 2023, Rhoades requested a qualified witness pursuant to 29-A M.R.S. § 2431(2)(D) (2025).[3] In July, the State provided the court with a witness list that did not include a qualified witness. The case was not reached in July, however, and was continued to September. In August, the State identified a qualified witness, informed Rhoades's counsel of the existence of impeachment information about that witness, and stated that before producing that information, the State would require a protective order to limit its distribution. Rhoades objected to the proposed protective order, but the court (*Roberts, J.*) issued it on August 31.

[¶13] On September 7, 2023, Rhoades filed a motion for sanctions, asserting that the State violated discovery rules and Rhoades's due process rights by failing to timely disclose impeachment information pertaining to the expected qualified witness.

---

[3] Section 2431(2)(D) provides: "With 10 days written notice to the prosecution, the defendant may request that a qualified witness testify to the matters of which the certificate constitutes prima facie evidence. The notice must specify those matters concerning which the defendant requests testimony. The certificate is not prima facie evidence of those matters."

6

[¶14]  On November 21, 2023, the motion for sanctions was dismissed without prejudice, but on November 30, the court (*Larson, J.*) vacated the dismissal after consideration of Rhoades's motion to reconsider.  The court (*Roberts, J.*) then held a hearing on the motion for sanctions on March 8, 2024, and issued a written order denying the motion a week later.

[¶15]  In that order, the court stated that the "District Attorney's office must be better prepared for trial in matters on the brink of jury selection" and that the "prosecutor should have been aware of the need for testimony from the officer presenting a *Giglio* problem before docket call in July."[4]  That said, the court declined to order sanctions despite the witness in question being identified late in the case's processing, noting that "[t]he court would have a very different view of the Defendant's request for sanctions had this matter been reached without the Defendant being provided with *Giglio* materials in a timely fashion."

[¶16]  At the jury trial, held on July 29, 2024, the State did not present the witness as to whom the impeachment information pertained.

---

[4]  *Giglio* information is information that may be used to impeach or discredit a witness for the State.  Prosecutors are required to disclose such information to the defense. *See Giglio v. United States*, 405 U.S. 150 (1972).

[¶17] The arresting officer testified that on the document recording the results of the Intoxylizer test, he had written down the date on the machine that indicated when the machine had last been tested. The officer testified that error codes would appear if the air samples were insufficient for taking the sample and that no error code had appeared when he was testing Rhoades.

[¶18] The officer's testimony was followed by the testimony of Maria Pease, the manager of the breath-alcohol program in the forensic chemistry section of the State's Health and Environmental Testing Laboratory. Pease, a chemist, testified that her primary responsibility is to ensure that instruments are approved twice a year according to state regulations. She stated that the approval process consists of a chemist going to the site of an Intoxilyzer machine, performing a visual inspection of the instrument, and running a series of control tests. When an instrument is approved, a stamp is affixed to it that contains a serial number, the date, and the signature of the chemist. Pease testified that she is usually the person who affixes the stamp, but that one other analyst has some of the same training and does so as well. Although she indicated that she had performed regular checks on the instrument at the Lincoln Police Department, she stated that she was not entirely sure if she

8

performed the checks in 2022, though she stated that she knew that they were done.

[¶19]  Pease also testified to the safeguards in place to ensure that the Intoxilyzer is generating accurate results for any given sample, including administering a second test two minutes after the first.  She explained how, when the Intoxilyzer is running, it goes through various controls and diagnostics before reading a breath sample and will notify the operator with messages if something is wrong, such as a temperature failure, and will abort the test.

[¶20]  After this testimony by the officer and Pease, the State moved to admit the results of the test.  Rhoades objected, arguing that there was insufficient evidence that the results were reliable because Pease could not testify with certainty that she had been the one who performed the most recent test of the machine.  The court admitted the results.

[¶21]  At the end of the trial, the jury returned a guilty verdict.  Rhoades was sentenced to nine months in the Penobscot County jail, received a six-year license suspension, and was ordered to pay $1,410 in fines and fees.  He appealed the same day.  *See* M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

**A.    The officer had reasonable articulable suspicion to stop Rhoades's vehicle based on the officer's estimation that Rhoades was speeding.**[5]

[¶22]   Rhoades argues that the court erred in denying his motion to suppress because the officer's visual estimation that Rhoades was speeding was not sufficient to give the officer reasonable articulable suspicion to initiate a stop.  We disagree.

[¶23]   We look to the suppression hearing record when reviewing Rhoades's argument on appeal.  *State v. Jandreau*, 2022 ME 59, ¶ 12, 288 A.3d 371.  In that hearing, the officer who stopped Rhoades's vehicle testified that he had been a member of the Lincoln Police Department for ten months and had, before that, been in the Penobscot County Sheriff's Office for eighteen years, with fourteen of those years on patrol.  He graduated from the Maine Criminal Justice Academy, where he had been trained and certified in visual estimation of vehicle speeds.  He testified that officers were trained to visually estimate speed within five miles per hour.  In his fourteen or fifteen years on patrol, he

---

[5] Rhoades raises his argument concerning the court's denial of his motion to suppress under only the United States Constitution, not article 1, section 5 of the Maine Constitution.  Therefore, the only issue before us is whether the motion to suppress should have been granted under the Fourth Amendment.  *See State v. Norris*, 2023 ME 60, ¶ 33, 302 A.3d 1.

had visually estimated speeds of vehicles daily and testified that his radar confirmed that his estimates were correct within three to four miles per hour.

[¶24] On the date of Rhoades's stop, the officer estimated that Rhoades had been driving fifty-five miles per hour in a thirty-five-mile-per-hour zone. The officer's angle was such that he could not use his radar.

[¶25] We review the court's factual findings for clear error and its ultimate decision to suppress de novo, *State v. Lovett*, 2015 ME 7, ¶ 6, 109 A.3d 1135, and will "uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Vrooman*, 2013 ME 69, ¶ 11, 71 A.3d 723 (quotation marks omitted).

[¶26] "In order to support a brief investigatory stop of a motor vehicle . . . a police officer must have an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." *State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984 (footnote omitted). This threshold for a vehicle stop is "low, in that 'reasonable articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence,' and need not rise to the level of probable cause. 'The suspicion need only be more than speculation or an

unsubstantiated hunch.'" *State v. LaForge*, 2012 ME 65, ¶ 10, 43 A.3d 961 (citations omitted).

[¶27] An officer's visual estimate of a vehicle's speed can be a sufficient basis to establish reasonable articulable suspicion justifying a stop.[6] The relevant analysis is one in which the court assesses the totality of the circumstances. *See United States v. Sowards*, 690 F.3d 583, 591, 592 (4th Cir. 2012) (holding that whether a visual speed estimate is sufficient to initiate a stop depends on the totality of the circumstances, and "the reasonableness of an officer's visual speed estimate depends, in the first instance, on whether a vehicle's speed is estimated to be in significant excess or slight excess of the legal speed limit"). In this instance, as the court noted, the officer stated that he visually estimated that Rhoades was driving twenty miles per hour above the speed limit, an infraction significant in magnitude. The court noted that the officer was trained and certified in speed estimation and checked himself frequently against his radar. Based on the totality of the evidence before it, the

---

[6] Other jurisdictions have explicitly held that visual speed estimates are sufficient to initiate a traffic stop. *See United States v. Ludwig*, 641 F.3d 1243, 1247 (10th Cir. 2011) ("It's long been the case that an officer's visual estimation can supply probable cause to support a traffic stop for speeding in appropriate circumstances."); *State v. Dunham*, 67 A.3d 275, 278 (Vt. 2013) ("Many courts have held that a sufficiently trained officer's visual estimate of speed can supply reasonable suspicion to justify a traffic stop, and in some cases, probable cause."); *United States v. Monzon-Gomez*, 244 F. App'x 954, 959 (11th Cir. 2007) ("The Fourth Amendment plainly does not prohibit a law enforcement officer from pulling over a motorist for suspected speeding whenever the officer is acting solely on the basis of his visual observation.").

12

court committed no error in finding that the officer had reasonable articulable suspicion and denying the motion to suppress.

**B.      The trial court did not err in admitting the results of the Intoxilyzer test.**

[¶28]  Rhoades asserts two arguments to challenge the admission of the results of his Intoxilyzer test.  First, he contests the admissibility of the results under the relevant statute and claims that the results are unreliable.  Second, he argues that his rights under the Confrontation Clause were violated because Pease was not certain that she had personally performed the latest test on the machine.[7]  U.S. Const. amend. VI.  Again, we disagree.

**1.      The Intoxilyzer test results were admissible under the statute and were otherwise reliable.**

[¶29]   Rhoades's argument as to compliance with the statute and the reliability of the Intoxilyzer test results is preserved.  As to his claim that the statutory requirements for admission of the results were not met, we review questions of statutory interpretation de novo.  *State v. Beeler*, 2022 ME 47, ¶ 12, 281 A.3d 637.  We review a trial court's admission of evidence over an objection

---

[7]   Rhoades raises his Confrontation Clause argument under the United State Constitution, not article 1, section 6 of the Maine Constitution.  Therefore, the only issue before us is whether Pease's testimony violated his rights under the Sixth Amendment.  *Cf. State v. Engroff*, 2025 ME 83, ¶ 24, 345 A.3d 91.

for lack of foundation for abuse of discretion and the court's "underlying factual findings" for clear error. *Id.* (quotation marks omitted).

[¶30] The arguments asserted by Rhoades are the same as those discussed in detail and rejected in *Beeler*. Briefly, under the relevant statute regarding the admissibility of breath-alcohol test results, 29-A M.R.S. § 2431, when, as here, a defendant requests a qualified witness, the State must establish the reliability of a test result through witness testimony rather than through the presence of compliance labels affixed to the instrument. *Beeler*, 2022 ME 47, ¶ 14, 281 A.3d 637. As we stated in *Beeler*:

> The State need establish only that the test is reliable. In making the initial reliability determination, the court can rely solely on the testimony of the State's chemist that the result was reliable. Once the foundational showing of reliability has been made and the test result is admitted, the weight to be given the test result is a question for the fact finder.
>
> Thus, the relevant inquiry here is whether the trial court erred by finding that the State had made a sufficient showing that [the defendant]'s breath test result was reliable.

*Id.* ¶¶ 14-15 (alterations, quotation marks, and citations omitted).

[¶31] In *Beeler*, we affirmed the court's admission of breath test results for the following reasons:

> The chemist testified at length about the functioning of Intoxilyzers generally—including that an Intoxilyzer will not proceed with a breath test if it fails any of its internal diagnostic tests—and about

the procedures at the state laboratory regarding the maintenance and approval of Intoxilyzers. The chemist also testified about the Intoxilyzer used in [the defendant]'s breath test, noting that the instrument had been approved before it was put into service and that it passed all testing when it was returned to the state laboratory. After addressing each step in the breath testing sequence as reflected on [the defendant]'s breath test certificate and determining that the Intoxilyzer passed all internal diagnostic tests and calibration checks, the chemist opined that the Intoxilyzer produced a valid test result. The chemist's testimony alone was sufficient to establish that [the defendant]'s breath test result was reliable, and the chemist's testimony coupled with the trooper's testimony—including that he was a certified Intoxilyzer operator, he followed proper breath testing procedures, and the Intoxilyzer bore the Department's stamp of approval—was more than sufficient.

*Id.* ¶ 15.

[¶32] The same circumstances presented themselves here, and the same type of evidence was produced. As we stated in *Beeler*, such evidence was "more than sufficient" to ensure that the statutory requirements and the requirement for reliability were met.[8] *Id.*

### 2. Rhoades's rights under the Confrontation Clause were not violated.

[¶33] Rhoades did not raise a Confrontation Clause objection at trial; thus, we review only for obvious error. *State v. Richardson*, 593 A.2d 218, 219

---

[8] Rhoades's brief includes no argument to distinguish this case from our decision in *Beeler*. The State's brief does not cite *Beeler* at all.

(Me. 1991).[9]

[¶34] We also addressed a Confrontation Clause argument in *Beeler. See* 2022 ME 47, ¶¶ 19-28, 281 A.3d 637. There, we explained, inter alia, that breath test results are nontestimonial.[10] *Id*. ¶ 26. We explained that "[t]he

---

[9] Rhoades raised the Confrontation Clause argument in his initial brief. The State did not respond to this argument at all in its responsive brief. The State clarified in oral argument, when asked, that it was not conceding that a Confrontation Clause violation had occurred. When the State fails to address a non-frivolous argument raised by a defendant on appeal, it does so at its peril, risking sanction or a deemed concession. *See United States v. Vargas-De Jesús*, 618 F.3d 59, 64 (1st Cir. 2010) (noting that when the government did not articulate a defense of a conviction until oral argument, the appellate court "would be justified in treating the failure to brief the issue as a waiver"); *cf.* Christopher Bello, Annotation, *Consequences of Prosecution's Failure to File Timely Brief in Appeal by Accused*, 27 A.L.R.4th 213, § 2[a] (1984) ("Courts have responded to the prosecution's failure to file a timely appellee's brief in a variety of ways. In situations where, without excuse, no brief has been filed as of the time the case has been taken under consideration, courts have been divided between those reversing the defendant's conviction on the basis of the prosecution's inaction (§ 10[a], infra), and those applying only lesser sanctions, or merely reprimanding the prosecution, before proceeding to address the merits of the appeal and affirming or reversing the conviction on bases other than the prosecution's failure to file a brief (§ 10[b], infra).").

[10] *See Beeler*, 2022 ME 47, ¶ 24, 281 A.3d 637 ("The overwhelming majority of other jurisdictions have concluded that maintenance, inspection, and calibration records for the Intoxilyzer are nontestimonial in nature.") Nor is the test result itself testimonial. As one court noted:

The Intoxilyzer 5000 . . . is not a witness or declarant capable of making statements. . . . [N]o human entered into the Intoxilyzer 5000 the conclusion that [the driver]'s breath alcohol content was .22 grams per 210 liters of breath. [The driver] blew into the machine, the machine analyzed his breath and reported the results of its analysis. The machine was the sole source of the test results. Thus the result of the breath test was merely data produced by a machine, not a statement produced by a witness. *See United States v. Moon,* 512 F.3d 359, 362 (7th Cir.2008) ("[D]ata are not 'statements' in any useful sense. Nor is a machine a 'witness against' anyone."); *United States v. Washington,* 498 F.3d 225, 230 (4th Cir. 2007) ("'[S]tatements' made by machines are not out-of-court statements made by declarants that are subject to the Confrontation Clause."); *Caldwell v. State,* 230 Ga.App. 46, 495 S.E.2d 308, 310 (1997) (holding that printouts from a breath test machine "are not hearsay but rather the mechanically-generated reports automatically created by the machine. They do not constitute out-of-court statements by any person or the conclusion of a third party not before the court . . . ." (internal citations omitted)); *State v. Van Sickle,* 120 Idaho 99, 813 P.2d 910, 913 (Ct. App.1991) (a "printout from the Intoximeter is not a 'statement' for hearsay purposes . . . the printout is a test result produced by a

Confrontation Clause is concerned with the admission of testimonial statements by declarants who are not subject to cross-examination and not with whether the prosecution offered sufficient foundational evidence to support the admission of an expert witness's opinion." *Id.* ¶ 28.

[¶35] In short, the confrontation right under the federal clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). A breath test result is not testimony; it is machine-generated data. In testifying as to the reliability of the machine, Pease, the chemist here, did not act as a conduit for testimony from any another witness.

[¶36] Rhoades's argument relies upon decisions involving not machine-generated data but rather instances in which one chemist testifies regarding lab results requiring judgments made by another chemist. For example, in *State v. Thomas*, 2025 ME 34, ¶ 65, 334 A.3d 686, we stated that the Confrontation Clause was violated when one chemist testified and based his testimony upon the "worksheet and notes" of another nontestifying chemist.

---

machine"). . . . Because the breath test result is not a statement made by a witness, the Confrontation Clause does not place any restrictions on its admission.

*Wimbish v. Commonwealth*, 658 S.E.2d 715, 719-20 (Va. Ct. App. 2008).

Similarly, in *State v. Gleason*, 2025 ME 52, ¶ 7, 19, 339 A.3d 774, a toxicologist testified based upon her review of the "data and documentation" produced by other lab employees who conducted the relevant tests and conceded that "the data she reviewed was the product of judgments made by other reviewers and lab employees." *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), involved a *blood* test conducted to determine blood-alcohol concentration. The Supreme Court expressly noted that the lab report "reported more than a machine-generated number." *Id.* at 659-60; *see also id.* at 673 (Sotomayor, J., concurring) ("[T]his is not a case in which the State introduced only machine-generated results . . . .").

[¶37] Nothing in the more recent decisions of the Supreme Court suggests any deviation from the conclusion that machine-generated data is nontestimonial and, therefore, the admission of such machine-generated data does not implicate the Confrontation Clause. *See United States v. Hill*, 63 F.4th 335, 359 (5th Cir. 2023).[11]

[¶38] In sum, testimony from the specific individual who carried out the

---

[11] We also note that many jurisdictions conclude that there is no Confrontation Clause issue invoked by the certifications relating to breath test machines because such certifications are made for administrative purposes and not in support of a specific criminal prosecution. *See e.g.*, *Commonwealth v. Zeininger*, 947 N.E.2d 1060, 1069-70 (Mass. 2011); *State v. Fischer*, 726 N.W.2d 176, 183 (Neb. 2007); *State v. Maga*, 96 A.3d 934, 938-40 (N.H. 2014); *Commonwealth v. Dyarman*, 73 A.3d 565, 571-74 (Pa. 2013); *Bohsancurt v. Eisenberg*, 129 P.3d 471, 476 (Ariz. Ct. App. 2006); *Rackoff v. State*, 637 S.E.2d 706, 709 (Ga. 2006); *People v. So Young Kim*, 859 N.E.2d 92, 94 (Ill. App. Ct. 2006);

biannual test of the machine is not required under the statute, to show reliability, or for Confrontation Clause purposes.

## C. The trial court did not abuse its discretion in declining to impose a discovery sanction.

[¶39]  Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "a due process violation occurs when the government fails to disclose evidence that is favorable to an accused and material either to guilt or to punishment." *State v. Wai Chan*, 2020 ME 91, ¶ 15 n.8, 236 A.3d 471 (quotation marks omitted).  In *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court held that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the *Brady*] rule."  (Quotation marks omitted.)  *See also State v. Williams*, 2022 ME 24, ¶ 6 n.3, 272 A.3d 304.

[¶40]  Rhoades argues that by delivering *Giglio* information late in the case, the State committed a discovery violation for which it should have been sanctioned.  We "review for an abuse of discretion decisions on the imposition of sanctions for discovery violations." *Bean v. Cummings*, 2008 ME 18, ¶ 15, 939

---

*Jarrell v. State*, 852 N.E.2d 1022, 1025-26 (Ind. Ct. App. 2006); *Commonwealth v. Walther*, 189 S.W.3d 570, 574-75 (Ky. 2006).  *See generally Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) (noting that statements are testimonial if their primary purpose is to establish or prove past events potentially relevant to later prosecution).

A.2d 676. We "will not characterize a trial court's decision not to impose sanctions as an abuse of discretion or an error of law unless the defendant has shown that he was in fact prejudiced by the discovery violation . . . and that the prejudice rose to the level of depriving him of a fair trial." *State v. Gould*, 2012 ME 60, ¶ 24, 43 A.3d 952 (quotation marks omitted).

[¶41] Rhoades has failed to demonstrate that he was prejudiced by any late delivery of the *Giglio* information in this case. The expected qualified witness to whom the *Giglio* information pertained did not testify at trial. Also, Rhoades received the relevant information months prior to trial. *See State v. Kelly*, 2000 ME 107, ¶ 26 n.11, 752 A.2d 188 (stating that, in the case of an alleged *Brady* violation, "[w]hen the defendant is aware, before trial, of the exculpatory evidence alleged to have been withheld, he cannot claim that there has been an unfair trial in violation of due process"). Absent prejudice, no abuse of discretion occurred.

### III. CONCLUSION

[¶42] The State's actions both in prosecuting this matter at trial and in defending the judgment on appeal reflect multiple deficiencies. Had the matter gone to trial when first scheduled, the State would have failed to identify a qualified witness as statutorily required, and the results of Rhoades's breath

test would have properly been excluded.  The trial court rightly commented on the State's dilatory preparation in identifying a qualified witness and in producing a qualified witness at trial.  The State's failures to cite *Beeler*, the decision on point as to the admissibility of the breath results, and to respond at all to Rhoades's Confrontation Clause argument in its appellate brief are inexplicable.

[¶43]  Nonetheless, Rhoades's appeal fails under our standard of review and the relevant law: the officer's speed estimate was sufficient for the officer to stop Rhoades's vehicle; the results of Rhoades's breath test were admissible under the relevant statute and law; and Rhoades did not identify any prejudice from the late discovery of *Giglio* evidence relating to a witness who did not testify at trial.

The entry is:

Judgment affirmed.

James P. Howaniec, Esq. (orally), Lewiston, for appellant Kenneth Rhoades

R. Christopher Almy, District Attorney, Christopher D. Smith, Asst. Dist. Atty. (orally), and Eugene Abramov, Stud. Atty., Prosecutorial District V, Bangor, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2022-3806